UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| REGINA GRAVES WILLIAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5: 20-115-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| CITY OF STANFORD, KENTUCKY, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

A one-room log cabin constructed around 1811 is at the heart of this dispute. It sat on a piece of land that would eventually become 135 Hustonville Street in Stanford, Kentucky. For at least 50 years,[1] the cabin was hidden by a larger home constructed around it. Emma Stewart purchased the property in 1968, but she abandoned it in 2008 and passed away four years later. After Stewart's death, none of the plaintiffs (her living heirs) visited the home or maintained the property. In fact, her eldest daughter believed the family no longer owned it. Thus, much like any memory of the original cabin's owners has likely been lost to history, the identity of its current owner was unknown to Defendant City of Stanford, Kentucky ("the City") for nearly a decade.

Nature took a toll on the property over time. Beginning in August 2017, it was cited for ordinance violations seven times over twenty months. Because no one contested the violations or paid the attendant fines, the City abated each violation at its own expense. In

---

[1]    The exact date of the outer home's construction is not in the record.

- 1 -

April 2019, Defendant Jeff Knouse, the City's Code Enforcement Officer, finally declared the home an imminent danger and demolished it without notice to the heirs.  The demolition revealed the cabin, which spawned a news story that, in turn, alerted Stewart's heirs to the demolition.  The heirs initiated this action to recover damages for unlawful demolition.

The parties have moved for summary judgment.

## I.      FACTUAL BACKGROUND[2]

### A.      The Home at 135 Hustonville Street

The plaintiffs are the living descendants of Stewart (collectively, "the Estate"), the owner and once-occupant of the home at 135 Hustonville Street.  [Record No. 35, p. 9]  As mentioned, Stewart purchased the property in or around 1968.  [*Id.*]  Her daughter, Regina Graves Williams, described the home as "a white framed house, two stories with—on a relatively large piece of property with an outbuilding in the back.  The house [] probably had six rooms, one bath[room].  [Emma Stewart] added an addition, one additional room, onto the house."  [*Id.* at p. 11]  The house also had a small front porch, a front window framed by greenery, and a single chimney emerging from the center of the home.  A concrete driveway and walking path led to the home from Hustonville Street.  [*See* Record Nos. 34-4, p. 6; 33-1, p. 2.]

Stewart's heirs left Stanford long before the home caught the City's attention.  [*See* Record No. 1, ¶¶ 6-12.]  Williams, Stewart's only living child, moved away in 1971.  [*Id.* at p.

---

[2]      At the summary judgment stage, the Court views the evidence in the light most favorable to the nonmoving party and draws inferences in its favor.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  However, as mentioned, both sides have moved for summary judgment.  Thus, the facts are recounted as the parties allege them, and disputes are noted.

9] Plaintiff Ka'Sondra Brown[3] is Stewart's granddaughter and Williams' niece. [Record Nos. 35, p. 9; 34, p. 9] Brown considered the Hustonville property her home—she and her younger brother, Andre Brown, lived there for much of their youth. [Record No. 34, pp. 9-12] But Brown moved to Lexington, Kentucky after college (around 2005) and continues to reside there today. [*Id.* at p. 11] The remaining plaintiffs are Williams' nieces and nephews or their spouses. [Record No. 35, pp. 8-9] They do not reside in Stanford, nor have they provided testimony in this matter.

A 2008 fire forced Stewart to abandon the home. [Record Nos. 30-9; 34, p. 14; 35, p. 12] On the morning of September 30, she awoke to discover that the electricity was out. [Record Nos. 35, p. 12; 30-9, p. 2] And after confirming with her utility provider that her electricity should have been functioning, Stewart called the Stanford Fire Department. [Record No. 30-9, p. 2] A fire crew was dispatched. Upon arrival, Captain L. Lunsford noticed white smoke emanating from the attic. [*Id.* at pp. 1, 5] The firemen cut a 4-foot by 4-foot hole in the roof to access the attic, identified the source of the fire, and extinguished it. [*Id.*] The fire was blamed on "[v]ery old faulty wiring;" specifically, exposed wiring connections were in close proximity to flammable insulation. [*Id.*]

Extinguishing the fire left the home in a state of disrepair. As a precaution against further damage, the firemen had spread salvage tarps in the living room and "proceeded to pull the ceilings to further eradicate the threat of fire by removing the blown in insulation in the attic." [Record No. 30-9, p. 2; *see also* Record No. 35, pp. 12-13.] Thus, a chandelier that hung from the living room ceiling was ripped down. [Record No. 35, p. 12] A large hole was

---

[3] Although she and her brother, Andre Brown, are both parties to this action, Ka'Sondra Brown will be referred to as Brown because her testimony is in the record.

left in the roof near the chimney. [*Id.*; Record No. 34, p. 18] Most importantly, the home was left without functioning electricity. [*Id.* at p. 14]

Stewart would not reside in the home for the remainder of her life. Because she was unable to resolve an insurance claim to her satisfaction, she lacked the means to repair the home. [Record No. 35; p. 20; *see also* Record No. 35-2.] Stewart moved to a hotel for a few days, then moved in with Brown, and eventually found an apartment in which to live. [Record No. 34, p. 17] Stewart was diagnosed with cancer a few years later and moved into a nursing home. [Record No. 35, pp. 17-18] She passed away on June 9, 2012. [*See* Record No. 34, p. 10.]

Stewart's heirs did not seek to administer her estate following her death. Williams believed the property no longer belonged to the family—she was under the impression that the nursing home had taken ownership of the home as payment. [Record No. 35, pp. 52-53] Brown knew that Stewart owned the property, but she was not aware that any action needed to be taken to open an estate upon Stewart's death.[4] [Record No. 34, p. 39] After the events giving rise to this action, a petition to appoint Williams at executrix of Stewart's estate was filed on May 17, 2019. [Record No. 35-4]

---

[4]     In fact, Brown had owned the property for a brief time prior to Stewart's death. [Record No. 34-1] On April 20, 2009, Stewart conveyed the property to Brown by written deed. [*Id.* at pp. 4-6] According to Brown, the conveyance was an effort by Stewart to ensure that the property was taken care of in the event of her death. [Record No. 34, p. 36] Nevertheless, the property was conveyed back to Stewart fifteen months later. Brown could not recall why she conveyed the property back to her grandmother on July 26, 2010. [*Id.* at p. 38; *see also* Record No. 34-1, pp. 1-3.]

- 4 -

## B.      Stanford's Nuisance Ordinances and Enforcement

In 2016, Kentucky passed House Bill 422, which amended the State's model ordinance provisions. *See* Ky. Rev. St. §§ 65.8801, *et seq.* Stanford adopted the changes through Ordinance 2017-0501 ("Ordinance 501"). [*See* Record No. 30-10.] It generally prohibited the maintenance of "any public nuisance within the City." [*Id.* at § 92.01]

Multiple categories of public nuisance were identified in Ordinance 501. An "Environmental Nuisance" was defined as an action posing a "hazard or injury which may be detrimental to the property or well-being of others," including:

> (1) Injur[ing] or endanger[ing] the welfare, health, or safety of others;
> . . .
> (5) Interfer[ing] with the comfortable enjoyment of life and property or tend[ing] to depreciate the value of the property of others;
> . . .
> (7) Permitting any yard grass, other plant or weed growth exceeding twelve (12) inches in height other than crops, trees, bushes, flowers, or other ornamental plants; [and]
> (8) Disposing or accumulating of any foul, decaying or putrescent substance, stagnant water, animal waste, carcasses of any type of animal, or other offensive material in or on any lot, tract of land, street, highway, or any sidewalk or alley abutting any of these which shall be the reasons for such offensive odors;
> . . . .

[*Id.* at § 92.02(C)]

"Dilapidated Housing" also constituted a nuisance where a "finding of unfit for human habitation" was made. [*Id.* at § 92.02(E)] Conditions that warrant a finding of unfit for human habitation include:

> conditions that exist which are dangerous or injurious to the health, safety, or morals of the occupants of such structure, neighboring structures or other residents of the city. Examples of such conditions include but are not limited to: defects increasing the hazard of fire, accidents or other calamities, lack of adequate ventilation, light or sanitary facilities, violations of any other laws of the Commonwealth of Kentucky, Kentucky Building Code or other Ordinance of the City of Stanford.

[*Id.*]

The ordinance also established a Code Enforcement Board ("the Board").  The Board was empowered to enforce the ordinance, but all enforcement actions had to be initiated by a Notice of Violation served by the Code Enforcement Officer.  [Record No. 30-10, § 41.08(A) and (B)] A notice would provide the recipient with time to remedy the violation, after which the Code Enforcement Officer was authorized to issue a citation.  [*Id.* at § 41.08(B)]  However, these procedures only applied if there was no need for "immediate action."  [*Id.* at § 41.08(C)]

A citation had to be served in one of three ways.  As relevant here, the Code Enforcement Officer could serve the citation by "[p]osting a copy of the citation in a conspicuous place on the premises and mailing a copy of the citation . . . to the owner of record of the property."  [*Id.* at § 41.08(D)] The recipient of a citation was warned that he or she "shall respond" within seven days by either paying the fine or requesting a hearing to contest the violation.  [*Id.* at § 41.08(G)]  Failure to do so would constitute a waiver of the right to contest the violation and result in a final order of violation.  [*Id.*]  A final order empowered the City to impose a lien on the property to cover its costs.  [*Id.* at § 41.12]

Moreover, the Code Enforcement Officer was empowered to issue demolition orders. If, "in the opinion of the Code Enforcement Officer," an "[i]mminent danger exists on the subject property that necessitates immediate action," or "[t]he structure is so old, dilapidated, or has become so out of repair as to be dangerous, unsafe, unsanitary or otherwise unfit for human habitation or occupancy," the Ordinance required the Code Enforcement Officer to order demolition.  [Record No. 30-10, § 92.10(A)]  Alternatively, where there was no imminent danger, a demolition order required 30 days' notice and a hearing by the Code Enforcement

- 6 -

Board prior to demolition.  At such hearing, the Code Enforcement Officer would be required to make a showing that "substantial evidence" supported the order.  [*Id.* at § 92.10(B) and (C)]

"Upon final determination that the structure shall be demolished by the city, or when an imminent danger exists that will not permit the delay associated with a hearing," the Code Enforcement Officer was required to "cause the structure to be razed and removed," with the costs of such removal taxed to the owner.  [*Id.* at § 92.10(D)] Anyone affected by a demolition order was given 30 days to appeal the order to the Code Enforcement Board.  [*Id.* at § 92.10(E)] Additionally, demolition orders were not made the exclusive remedy to abate a condition that may otherwise qualify for demolition.  In other words, the Code Enforcement Officer was not precluded from pursuing "other available remedies" to abate a nuisance, nor would those remedies preclude the officer from issuing a demolition order.  [*Id.* at § 92.10(F)]

### C.    The Condition of the Property from 2012 Through 2018

Brown took responsibility for maintaining the property upon Stewart's death.  But because she lived in another city, she rarely had an opportunity to visit the property.  Indeed, her only visit between 2012 and 2019 was prompted by a report of trespassing.  [Record No. 34, p. 35] A law enforcement officer contacted her at some point to request that she post no trespassing signs on the home.  [*Id.* at p. 33]   She recalled that the officer said "Stanford was inundated with . . . transients" that may be accessing the home.  [*Id.*]  Thus, Brown posted trespassing warnings on the exterior of home, but she did not enter the structure because she was afraid someone may be inside.  [*Id.* at pp. 34-35]

Otherwise, the property was largely neglected prior to 2017.  Before Stewart's death, Jerry Wilkinson, a local pastor, mowed the grass.  [Record No. 34, pp. 22-23; 35, pp. 37-38] But Brown heard that he quit sometime after Stewart's death.  [*Id.* at 24]  She acknowledged

that no mowing or landscaping was performed from 2014 through the end of 2016.  [*Id.* at pp. 28-29] Beginning in 2017, she allegedly attempted to hire several people to maintain the property.  [*Id.* at 24]

By August 2017, the property was severely overgrown.  In fact, weeds and bushes had grown so tall that the home was barely visible from the street.  [*See* Record No. 33-1, p. 4.] The driveway was almost nonexistent, and the porch was fully enclosed by bushes.  [*Id.* at pp. 5-6] Knouse, the City's newly established Code Enforcement Officer, determined that the condition of the property violated Ordinance 501.  [*See* Record Nos. 33, p. 30; 33-1, p. 1.]  He pulled the property's valuation card on file with the City and found Brown's name listed as thes caretaker.  [*See* Record No. 33, pp. 59-60]  On August 14, 2017, he posted a notice of violation on the property informing the owner that the grass had had grown "in excess of five feet" in violation of City ordinance; he also mailed a copy to Brown.  [Record No. 33-1, p. 1] Per Ordinance 501, the notice required corrective action within seven days.  Otherwise, a citation would issue and a fine imposed.  [*Id.* at p. 1]

No corrective action was undertaken by Brown.  [*See* Record Nos. 33; pp. 66-67; 33-1, pp. 8-12] Consequently, Knouse served the first citation on the property on August 22, 2017, imposing a $250 fine.  [Record No. 33-1, p. 8]  The citation outlined the procedures in Ordinance 501: the recipient could contest the violation within seven days, which would trigger a hearing before the Board.  Conversely, failure to respond within seven days would waive the right to a hearing and result in a lien on the property.  [*Id.*]  Brown received the citation but did not request a hearing or pay the fine.  [Record Nos. 33, pp. 69-70; 34, p. 66] The City abated the first violation (mowed the grass), and a lien was placed on the property on September 26, 2017.  [Record Nos. 33-1, p. 13; 33, p. 68]

A second citation issued on October 2, 2017.[5]  [Record No. 33-1, p. 14]  Again, the grass and weeds exceeded the minimum height in Ordinance 501.  [*See* Record No. 33-1, pp. 15-19.]  This time, the potential fine doubled to $500.  The citation was mailed to Brown and posted on the property [Record No. 33-1, p. 20] but no action was taken.  Thus, the City abated the violation and imposed a second lien on the property.[6]  [Record No. 33-1, p. 25]

A third notice of violation was served on October 3, 2017.  [Record No. 33-1, p. 21]  While abating the prior violations, Knouse had observed that the home was open to the elements.  Specifically, he noticed the hole in the roof from the 2008 fire[7] and he observed that some of the home's windows were missing panes.  [Record No. 33, p. 73] Signs also were present that animals were "using the structure."  [*Id.*]  These concerns, combined with the owner's unresponsiveness, led Knouse to conclude that the home should be demolished.  [*Id.*]  Thus, the third notice warned the recipient that "[t]he structure is so old, dilapidated, and became [sic] so out of repair to be dangerous, unsafe, and unsanitary for human habitation or occupancy."  [Record No. 33-1, p. 21]  It directed the owner to "demolish[] and remove[]" the structure from the property within a month.  [*Id.*]  Again, the suggested action was not undertaken.

---

[5]    The notice of violation preceding this citation is not in the record, but the Estate has not disputed that it issued.

[6]    For some unexplained reason, the liens for the second and third violations were not imposed until April 11, 2018.  [*See* Record No. 33-1, pp. 25-26.]

[7]    Brown and Williams both testified that the hole in the roof was repaired, albeit in a temporary fashion.  [Record Nos. 34, pp. 45, 78; 35, pp. 25-26]  They recalled that at some point after the fire, a tarp was placed over the hole in the roof.  [*Id.*]  However, neither Brown nor Williams visited the home to observe the roof between 2017 and 2019.  Pictures taken by Knouse confirm that the tarp was eventually removed, and the hole was open to the elements.  [*See* Record No. 33-1, pp. 5-6, 12.]

A third citation, with a penalty of $1,000, was issued on November 7, 2017.  [*Id.* at p. 24]  This citation triggered a response from Brown.  Brown went to City Hall intending to meet with the mayor of Stanford, but she was directed to Knouse instead.[8]  Brown expressed that she felt her efforts to remedy the violations were going unnoticed by the City.  She was frustrated that the City was "continuing to [mow] it right behind me" and "continu[ing] to run up this so-called tab."  [Record No. 34, p. 47]

Brown requested that Knouse stop abating violations and assured him that she would take care of the property.  [*Id.* at p. 48]  Concerning the home, Brown stated that financially she could only "take care of the property itself," by which she meant "upkeep of the grass and pay[ment of] the taxes."[9]  [*Id.*; Record No. 33, p. 34]  She told Knouse, "I do not have the money for the structure."  [*Id.* at p. 49]  Knouse interpreted her comments as suggesting "the City just pretty much needed to do what they needed to do with the property because she

---

[8]      Brown and Knouse have competing recollections of the date of this meeting, but their memories of its substance are largely consistent.  Brown believes she met with Knouse in the spring of 2017.  [Record No. 34, pp. 46-47]  She stated that they discussed the "continued violations" she was receiving, the condition of the structure, and her inability to maintain the entire property.  [Record No. 34, pp. 46-49]  However, the first violation did not issue until well into the summer of 2017.  And no violation concerning the structure issued until October 2017.  For his part, Knouse testified that "sometime within seven days" of the first demolition citation, Brown came to his office to discuss her inability to maintain the property.  [Record No. 33, pp. 33-34, 74]  Thus, for the purposes of this motion, the Court establishes that the meeting occurred after the demolition citation in November 2017.

[9]      Brown testified that she paid the Lincoln County property taxes on the property each year, but the defendants have provided documents that dispute her testimony.  [Record Nos. 34, pp. 49-50; 35-5, pp. 1-10]  The City of Stanford property taxes were not timely paid for the years 2011 through 2019.  [*See* Record No. 34-2]  Brown testified that she was not aware of these taxes because she never received them.  [Record No. 34, p. 50]  She testified that she paid taxes directly to "the sheriff," but the Lincoln County property taxes were also not paid for the years 2012-2018.  [Record No. 35-5]  Whether the taxes were paid is not material to the disposition of the current motion.

couldn't do it." [Record No. 33, p. 34] He also "strongly advised" Brown to appeal the citation, but she chose not to. [*Id.*] Ultimately, a lien was placed on the property in the amount of the third citation, but no abatement costs were incurred because the City did not demolish the home. [*See* Record No. 33-1, p. 26]

A pattern of notice, citation, abatement at City expense, and lien order continued through the end of 2018. Despite Brown's stated intent to service the property, four additional violations for excessive grass height were imposed. [*See* Record No. 33-1, pp. 27-40] Knouse noticed "no efforts . . ., none whatsoever," to maintain the property. [Record No. 33, p. 55]

### D.     The Demolition

The condition of the home continued to deteriorate. On April 11, 2019, Knouse was working at a property across Hustonville Street from the Stewart home. [Record No. 33, p. 44] From there, he "watch[ed] buzzards carry dead animals . . . right in through the roof of the Stewart property." [*Id.*] After finishing work, he went over to investigate. He observed "the structure coming apart on the back corner" of the house "and the hole in the roof" where the birds were roosting. [*Id.*] Knouse felt that the structure had become dangerous and the City "needed to take it down before it fell on somebody." [*Id.* at p. 76] He consulted with the city attorney and issued a determination of imminent danger for 135 Hustonville Street the same day. [Record No. 33-1, p. 41] The determination stated: "House on property is open to the element and animals, subjecting it and neighboring properties to an imminent risk of collapse and fire." [*Id.*] Knouse testified that he considered these conditions an environmental nuisance under Ordinance 501. [Record No. 33, p. 53]

Knouse immediately began arranging for demolition of the home. He visited the property again on April 12, 2019, "to make sure there w[ere] no squatters or no homeless

person[s]" or valuables inside.  [Record No. 33, p. 77]  He entered the home through a back door that was open "[e]very time" he had been on the site.  [*Id.* at p. 78]  He did not find any people or furnishings.  Instead, he found that the dry wall was "falling off the house," and there were boxes, clothes, and animal feces "scattered" on the floor, which was caving in.  [*Id.* at pp. 45; 78]  In fact, Knouse was worried that the floor under his feet would fall through. [*Id.*] The City demolished the home the next day.[10]  [*See* Record Nos. 30-6, p. 1; 33, p. 49.]

The City intended to remove the home from the property completely, but the contractor discovered a log cabin at the center of the home.  [Record No. 33, p. 49]  The contractor "worked around it" in an effort to retain as much of the original structure as possible.  [*Id.*]

The demolition sparked a public "outcry" in Stanford.  [Record No. 33, p. 50]  A local radio station reported the demolition, including a photo of the exposed cabin, on its Facebook page.  [Record No. 34-4]  The post elicited numerous comments, many of which expressed interest in the historical building.  Some comments were critical, however.  Brown was alerted to the post when a friend tagged her in a comment.  The original post stated that the "City had been keeping [the property] mowed for a few years," but Brown commented to dispute that characterization.  She asserted that "there has been arrangement for private lawn care service to service said property."  [Record No. 34-4, p. 28] She also implored City Councilwoman Peggy Hester to contact her and hoped that the City would "do the right thing" concerning the property.  [*Id.* at pp. 28-30] One concerned commenter suggested that the City should have researched the property before destroying it, and Brown responded "[e]xactly." [*Id.* at p. 40]

---

[10]     The Estate's motion states that the home was demolished "sometime around April 22, 2019." [Record No. 29, p. 4] This dispute over the date of the demolition is addressed in more detail below.

On April 16, 2019, Stanford mayor Scotie Ernst contacted Brown via Facebook message and requested that she call him. [Record No. 34-3] Brown responded that she "ha[d] been advised to inform [him] that I am consulting with lawyers and until further direction from them I would kindly ask that anyone on property at this time is prohibited." [*Id.* at p. 2] Ernst responded that the City would continue to enforce its nuisance ordinances and he directed her to the city attorney. [*Id.* at pp. 4-5] Brown did not communicate with anyone from the City after these messages. [Record No. 34, p. 75]

On May 2, 2019, Williams and Brown, along with counsel, attended a Stanford City Council meeting. [Record Nos. 34, p. 72; 35, p. 20] The minutes indicate that Williams asked, on behalf of herself and Stewart's other heirs: (1) why the family was not contacted prior to the demolition; (2) why her mother's property was chosen; (3) why the steps that were taken were chosen; (4) whether the City will clean-up the property; and (5) whether the City would wrap and cover the cabin until the family decides how to proceed. [Record No. 35-1, p. 44] City Attorney John Hackley responded that the heirs needed to open an estate and establish a "representative of the family for the City to work with." [*Id.* at p. 45] He further stated the City's position that it would not discuss potential litigation at a City Council meeting. [*Id.*]

After Williams spoke, Councilwoman Hester questioned whether the property's ambiguous ownership would have been a reason to forego enforcement of the demolition order. [Record No. 35-1, p. 45] Hackley responded in the negative, because notice was not required to demolish the property. He explained to the Council that "there are two types of enforcement actions" that Knouse was empowered to take: "[s]imple nuisance issues" such as failure to mow, which require notice prior to abatement; and "immediate threat[s]," for which Knouse can "act without notification." [*Id.* at pp. 45-46] Williams then asked how the property

was an immediate danger, to which Hackley indicated "the home was open to the elements." [*Id.* at p. 46]  In the end, Hackley reiterated that the "next step" for the family was forming an estate, and he confirmed that the City would protect the cabin in the meantime.  [*Id.*]  The City eventually wrapped the cabin in a tarp and placed a temporary roof over it to protect the building from the elements.  [*See* Record Nos. 33, pp. 50-51; 34-4, p. 57.]

The log cabin itself is a 16.5-foot by 19-foot, single-room structure constructed out of tulip poplar, ash, and buckeye timber beams.  [Record No. 35-8] A dendroarchaeological[11] survey of fourteen samples cut from eight of the cabin's beams revealed that the timbers were harvested between the summer of 1811 and the spring of 1812.  [*See id.* at pp. 15-16.]  Some of the tree-rings dated back to 1640.  [*Id.*]

The Estate initiated this action to recover for alleged violations of federal and state law. Specifically, it asserts a cause of action for deprivation of federal constitutional rights pursuant to 42 U.S.C. § 1983, two causes of action for violations of rights under the Kentucky constitution, a common law trespass claim, and a cause of action under the Eminent Domain Act of Kentucky, K.R.S. § 416.540, *et seq*.   The City and Knouse are the remaining defendants.[12]

---

[11]     According to the survey, "trees deposit a layer of cells or a tree ring around their circumference" each year.  [Record No. 35-8, p. 2] "Dendrochronology is the science of assigning individual growth rings to the calendar year in which they were formed."  [*Id.*]

[12]     Knouse is named in both his official and personal capacity.  [Record No. 1] Originally, the Mayor of Stanford was also named as a party in this action in his official and personal capacity. [*Id.*]   On July 16, 2020, the defendants gave notice that the named mayor had passed away. [Record No. 17]  The Estate did not seek to substitute a party in his place.  However, Rule 25(d) of the Federal Rules of Civil Procedure provides that a public "officer's successor is automatically substituted as a party" upon death.  Thus, at least the official capacity claims against the Mayor of Sanford remain pending.  Nevertheless, "a suit under section 1983 against a defendant 'in his official capacity' is equivalent to a suit against the local government entity."  *Leach v. Shelby Cty.*

## II.   THE STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). The operative inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The moving party bears the initial burden to produce evidence that it is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 317. This burden is met simply by showing that there is an absence of evidence on an issue which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325.

Once the moving party has met its burden of production, the burden shifts to the nonmoving party to come forward with "specific facts" that indicate there is a "genuine issue" for trial. *Celotex Corp.*, 477 U.S. at 324; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). This burden requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmovant must "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.1994) (citation omitted).

---

*Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989). Therefore, to whatever extent the Mayor remains a party, his or her liability depends on whether the City is liable. That question is fully addressed below.

"The judge's function is not to weigh the evidence, but to decide whether there are genuine issues for trial." *Moses v. Baker*, 798 F. Supp. 2d 863, 865 (E.D. Ky. 2011) (citing *Anderson*, 477 U.S. at 249). If the burden shifts to the nonmovant, summary judgment is precluded only if a dispute exists over a fact that "might affect the outcome of the suit," not over facts that are "irrelevant or unnecessary." *Anderson*, 477 U.S. at 248. And an issue is "genuine" where the trier of fact could rationally resolve the issue in the nonmovant's favor. *Matsushita Elec.*, 475 U.S. at 586-87.

### III.   LEGAL ANALYSIS

The Estate moved for summary judgment on all counts on January 15, 2021. [Record No. 29] The defendants followed suit the same day. [Record No. 30] Eighteen days later, the defendants responded to the Estate's motion. [Record No. 31] However, to date, the Estate has not responded to the defendant's motion or filed a reply supporting its own motion. Generally, when a nonmoving party fails to respond to a properly supported motion for summary judgment, it is appropriate to grant the moving party's motion. *Wimbush v. Wyeth*, 619 F.3d 632, 636 (6th Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 322–23). Thus, keeping this general rule in mind, the Court will consider whether either party is entitled to summary judgment.

#### A.   The Federal Constitutional Claims

The Estate's federal claims are brought under 42 U.S.C. § 1983. This section creates a federal cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State[,] . . . subjects, or causes to be subjected," a victim "to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." 42 U.S.C. § 1983. The rights relied on by the Estate are secured by the Fifth and Fourteenth

Amendments.  The Fifth Amendment prohibits the government from taking private property for public use without just compensation.  U.S. CONST. am. V.  Additionally, the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. am. XIV s 1.  In this context, the amendments combine to guarantee procedural and economic safeguards against deprivations of property.

The Estate argues that the City committed an unconstitutional taking of its property in violation of the Fifth Amendment and that the predeprivation process provided by the City was less than what was constitutionally due under the Fourteenth Amendment.  It summarizes its argument as follows: "This case involves a *per se* taking of Plaintiffs' private property by the Defendant in violation of the Fourteenth Amendment of the United States Constitution." [Record No. 29, p. 5]

### i.    The Takings Claim

"A property owner may bring a takings claim under § 1983 upon the taking of his property without just compensation by a local government."  *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2179 (2019).  The owner's pursuit of or entitlement to postdeprivation remedies through established state procedures is irrelevant.  *Id.* at 2177, *overruling Williamson Cty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985).  Here, it is undisputed that the defendants razed the home without offering or providing compensation.  Thus, the Estate's claim at least "has the feel of a taking."  *Ostipow v. Federspiel*, 824 F. App'x 336, 341 (6th Cir. 2020).  That feeling is quickly rebuffed upon further inspection.

First, the Estate's property was not taken *per se*.  The concept of a *per se* taking, recognized by the Supreme Court in *Loretto v. Teleprompter Manhattan CATV Corp.*, deems

a "*permanent* physical occupation of property" a Fifth Amendment violation "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." 458 U.S. 419, 434–35 (1982) (emphasis added) (applying *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124  (1978)).  In *Loreto*, the city permanently attached "plates, boxes, wires, bolts, and screws to the [plaintiff's] building, completely occupying space immediately above and upon the roof and along the building's exterior wall."  *Id.* at 438.  There is no question that the defendants are not permanently occupying the Estate's property.

Setting aside this mischaracterization, the Estate's takings claim fails for a more fundamental reason: the defendants demolished the home to abate a nuisance.  The United States and Kentucky Constitutions prohibit takings of private property for a public purpose and without just compensation.  But takings attendant to the police power are not compensable. *See Ostipow*, 824 F. App'x at 342 ("The weight of authority holds that claims emanating from the use of police power are excluded from review under the Takings Clause.").  Kentucky's highest court held over 100 years ago that, "[i]n the exercise of the police power by [a city], property which is a menace to public safety or health may be destroyed without compensation when this is necessary to protect the public, but the public necessity is the limit of the right." *Polsgrove v. Moss*, 157 S.W. 1133, 1136 (Ky. 1913).  In other words, "compensation is not mandated when the state legitimately exercises police power to abate a property nuisance." *Embassy Realty Invs., Inc. v. City of Cleveland*, 572 F. App'x 339, 344 (6th Cir. 2014).

The Estate does not contend that the defendants' actions were outside the scope of the police power, nor could it.  Kentucky expressly permits its municipalities to take "immediate action to remedy a violation of its ordinances when there is reason to believe that the existence

- 18 -

of the violation presents imminent danger, [or] a serious threat to the public health, safety, and welfare . . . ." Ky. Rev. Stat. § 65.8838; *see also Johnson v. City of Paducah*, 512 S.W.2d 514, 516 (Ky. 1974) (recognizing the validity of destruction orders when the situation "present[s] an imminent and immediate threat to the safety of persons or other property").

Accordingly, the undisputed facts do not entitle the Estate to summary judgment on its federal takings claim. To the contrary, the defendants are entitled to summary judgment because their liability is precluded as a matter of law.

### ii. The Due Process Claim[13]

"[T]o establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Albrecht v. Treon*, 617 F.3d 890, 894 (6th Cir. 2010) (citation omitted). Neither party disputes that the Estate was deprived of its property interest in the real property at 135 Hustonville Street. Thus, the question is whether either party has demonstrated that they are entitled to summary judgment on the third element. In other words,

---

[13] Although it does not appear that the Estate is raising a substantive due process claim, the Court notes that the defendants have carried their burden of establishing that they are entitled to summary judgment on that claim. [Record Nos. 30-2, pp. 18-19; 32, pp. 11-12] The Sixth Circuit authorities cited by both parties emphasize that "[t]he demolition of a nuisance is not an unreasonable and arbitrary official act" that constitutes a *prima facie* substantive due process violation. *Embassy Realty*, 572 F. App'x at 344. Nor do such actions "shock the conscience" as a matter of law. *Id.*; *Harris v. City of Akron*, 20 F.3d 1396, 1405 (6th Cir. 1994) ("So far as we know, or have been informed, no court has held that it shocks the conscience for municipal authorities, acting pursuant to an unchallenged ordinance, to order the destruction of a building found by responsible officers to be a nuisance or threat to public health or safety."). Therefore, to the extent the Estate asserts a substantive due process violation, the defendants are entitled to summary judgment.

did the defendants provide the process that was constitutionally due?  As explained below, what process is due depends on the circumstances.

The Fourteenth Amendment does not protect against "*all* deprivations of life, liberty, or property by the State[,] . . . only against deprivations 'without due process of law.'"  *Parratt v. Taylor*, 451 U.S. 527, 537 (1981) (emphasis added), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986).  As a general rule, "the process that is due before the state may deprive an owner of property includes notice to the owner prior to the deprivation and an opportunity for a predeprivation hearing."  *Harris v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir. 1994).  This preference supposes that by considering a person's defenses *ex ante*, "substantively unfair and simply mistaken deprivations of property interests can be prevented."  *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d Cir. 2008) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972)).

Nevertheless, the general rule yields to an exception in situations that present an emergent need for action.  Where a deprivation without prior notice is the result of "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process," courts look instead to the adequacy of postdeprivation remedies.  *Parratt*, 451 U.S. at 539.  This exception recognizes that there are situations where "notice and a predeprivation process . . . [c]ould have resulted in the very threat to the public that the [action] was intended to prevent."  *Harris*, 20 F.3d at 1404; *see also S. Commons Condo. Ass'n v. Charlie Arment Trucking, Inc.*, 775 F.3d 82, 86 (1st Cir. 2014) ("By their nature, emergency situations require an immediate response.").

Courts look to state law to determine whether a situation presents an imminent danger.  *See Harris*, 20 F.3d at 1404.  And where state law prescribes procedures, "a state actor's

adherence to its summary-action procedures deserves deference." *Kinnison v. City of San Antonio*, 480 F. App'x 271, 277 (5th Cir. 2012). This is particularly true where, as here, the state provisions themselves are not challenged as unconstitutional—only their implementation is at issue. *See Harris*, 20 F.3d at 1404. To be sure, the deference afforded is not blind to allegations that its "invocation [wa]s arbitrary or amounts to an abuse of discretion." *Elsmere Park Club*, 542 F.3d at 418; *accord DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 614 (6th Cir. 2015).[14] But where the only question is whether a state actor's emergency determination pursuant to state law violated the Constitution, it is immaterial "whether an emergency actually existed." *Harris*, 20 F.3d at 1404.

### a.    The *Parratt* doctrine is applicable.

Because the defendants invoke *Parratt*'s emergency rationale, the Court must begin with whether it applies. Citing *Harris*, the defendants contend that the undisputed facts illustrate that "pre-deprivation process would be impractical and not mandated."[15] [Record No. 30-2, p. 15] The Estate did not attempt to distinguish *Harris*, nor did it respond to the defendants' arguments. Nevertheless, the Court will consider whether the defendants have

---

[14]    The Third Circuit recognized in *Elsmere* that the Sixth Circuit seemingly "applie[s] an even more deferential standard" than abuse of discretion. 542 F.3d at 418 n.4 (citing *Harris*, 20 F.3d at 1404). But the Supreme Court's subsequent decision in *Hodel v. Virginia Surface Mining and Reclamation Association, Inc.*, implies that emergency discretion is subject to challenge where a "pattern of abuse and arbitrary action [is] discernible." 452 U.S. 264, 303 n.46 (1981); *see also Catanzaro v. Weiden*, 188 F.3d 56, 62 (2d Cir. 1999) (*Hodel* indicates that emergency "discretion is not absolute."). The Estate makes no such allegation here.

[15]    The City does not invoke the Supreme Court's decision in *Monell v. Department of Social Services of the City of New York*, which held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." 436 U.S. 658, 694 (1978). Thus, the Court does not address whether the demolition was the result of "execution of [the City]'s policy or custom." *Id.*; *see Kinnison v. City of San Antonio*, 480 F. App'x 271, 275 (5th Cir. 2012) (collecting cases for the proposition that *Monell* liability may be waived).

- 21 -

carried their burden of establishing that no genuine dispute of fact precludes summary judgment on this issue.

Knouse was clearly empowered to order the home demolished as an initial matter.  As mentioned, Ordinance 501 was enacted by the City as an exercise of its powers pursuant to K.R.S. §§ 65.8801, *et seq*.  [Record No. 30-10]  Section 92.02(C) of the ordinance prohibits the "accumulating of any foul, decaying or putrescent . . . animal waste, [or] carcasses of any type of animal . . . ."  Knouse stated that he considered the home an environmental nuisance under this section after observing buzzards deposit dead animals in the attic and animal remains on the main floor.  [Record No. 33, pp. 44-45, 53, 78] Additionally, he had previously determined that the home was unfit for human habitation.  [Record No. 33-1, p. 21] A determination of imminent danger is triggered solely by "the opinion of the Code Enforcement Officer," and Knouse testified at length to the basis for his opinion.  [Record No. 30-10, § 92.10(A)]  Once the determination was made, Ordinance 501 contemplates demolition without prior notice to eliminate the threat to public safety.  [*Id.*]  Again, immediate actions to abate public health threats are expressly permitted under Kentucky law.  K.R.S. § 65.8838. Therefore, Knouse was empowered to declare the home an imminent danger and order it demolished.

Because Knouse followed the procedures for identifying an emergency, the Court must defer to his conclusion.  *Harris*, 20 F.3d at 1404.  It follows that the *Parratt* rule applies.  *Id.* In short, because predeprivation process would have been impractical under the circumstances, neither notice nor an opportunity to be heard were required.

In many ways, the Estate does not contest this conclusion.  It does not seriously contend with Knouse's determination that the home represented an imminent danger.  In fact, nowhere

- 22 -

in its discussion of its *federal* claims does it suggest that an emergent need did not support the demolition.  [*See* Record No. 29, p. 8.]  When discussing its *state* claims, the Estate argues that "there is no evidence that [its] home had to be demolished" because no one was observed "within the premises of the home," nor were neighbors "in danger of harm because of the condition of [the] home."  [Record No. 29, p. 10]

Even taking these allegations as true, Ordinance 501 does not predicate an emergency determination solely on the presence of immediately recognizable potential victims.  It generally required Knouse to determine that the house posed a danger.  And he made such a finding.  He believed that the home could collapse or catch fire at any time based on first-hand observations of the structure.  [*See* Record No. 33, p. 45.]  This is not surprising, given that it had been rendered unlivable due to a fire over a decade earlier.  [*See* Record Nos. 30-9, p. 2; 35, pp. 12-13.]  Knouse was also concerned that homeless individuals were routinely passing through the home, and these concerns were corroborated by his observations.  [*See id.* at pp. 33, 45 (Knouse observed clothes in the home), 53 (it appeared that someone had been "laying" in the floor).]  And Brown had the same concern.  [Record No. 34, p. 33]

But even if these observations were not enough to entitle Knouse's determination to deference (they are), the Estate offers no evidence that the home was not an imminent danger. None of the plaintiffs visited the home within years of its demolition, nor could they undermine his conclusions with first-hand accounts.  Thus, even if a more exacting standard of deference applied, Knouse's decision is properly supported by credible evidence and was reasonable under the circumstances.  *See Catanzaro*, 188 F.3d at 63 (looking to whether "competent evidence allowing the official to reasonably believe that an emergency d[id] in fact exist," then asking whether it was "arbitrary or amount[ed] to an abuse of discretion").  The house was an

- 23 -

imminent danger to the people of Stanford and the defendants' actions fall within the *Parratt* exception.

Finally, because *Parratt* applies, the Court must consider whether postdeprivation remedies existed "to assess the propriety of the [C]ity's action at some time after the initial taking" *Harris*, 20 F.3d at 1404 (quoting *Parratt*, 451 U.S. at 539). The defendants contend that postdeprivation remedies were adequate to address the Estate's concerns. They note that "[a]ll orders from code enforcement officers are appealable to the [Board], and the decisions of the [B]oard are subject to *de novo* review in state court." [Record No. 30-2, p. 17 n.23 (citing Record No. 30-10 §§ 92.10(E)] Additionally, Kentucky recognizes an action for "reverse condemnation" where a plaintiff alleges "an unauthorized taking, destruction or injury to their property." *Holloway Const. Co. v. Smith*, 683 S.W.2d 248, 249 (Ky. 1984) (citing *Com., Dep't of Highways v. Davidson*, 383 S.W.2d 346, 348 (Ky. 1964)). The Estate has not challenged these remedies as inadequate. *See Catanzaro*, 188 F.3d at 64. But even if it had, courts have found less stringent remedies adequate. *See Elsmere Park Club*, 542 F.3d at 423 (fact that there "was an administrative body empowered to hear the Club's appeal" was sufficient, even though the body did not, in fact, exist). And although the Estate did not take advantage of the available remedies, its concerns were addressed at a Stanford City Council meeting. In fact, Hackley thoroughly explained the procedures that entitled the defendants to take the challenged actions. [Record No. 35-1, pp. 45-46] Accordingly, postdeprivation remedies were adequate, and the defendants' actions did not violate the Fourteenth Amendment as a matter of law.

> **b.      Assuming *arguendo* that *Parratt* does not apply, the Estate received adequate predeprivation process.**

The Estate implicitly attempts to side-step *Parratt* by not mentioning it.  Instead, it contests the process leading up to the demolition.  Thus, for the sake of argument, the Court will assume in this section that *Parratt* does not apply.

The Estate argues that the City razed the home despite Brown's request to "cease pursuing such actions" *via* Facebook message to Ernst.  [Record No. 29, p. 8] It suggests that due process required to "a hearing on the subject of whether the Plaintiffs' home should be demolished" after Brown put the City on notice.  [*Id.*]  These arguments take for granted that the demolition occurred after Ernst and Brown's conversation.  The defendants attempt to rebut the Estate's arguments (an opportunity forfeited by the Estate) by arguing that the City was not, in fact, aware that Brown protested the action *prior to* the demolition.  [Record No. 32, p. 4]

Thus, the parties' central dispute concerns the date of the demolition.  If, at the Estate alleges, it occurred on April 22, 2019, predeprivation process appears more practical because Brown had already expressly requested that the City not enter the property.  [*See* Record No. 34-2 (Facebook messages between Ernst and Brown dated April 16, 2019).]  On the other hand, if the house was demolished on April 13, 2019, as the defendants contend, then the Estate's arguments call for impossible procedures.

There is undoubtedly a factual dispute over the exact date of the demolition.  Ordinarily, if such a dispute is genuine and concerns material facts, summary judgment would be precluded.  *See* Fed. R. Civ. P. 56(a).  Whether the demolition occurred six days after Brown protested it is material to whether a predeprivation hearing should have been conducted.

However, the Estate's motion merely states that the defendants destroyed the home "sometime around April 22, 2019." [Record No. 29] The defendants contend that this allegation, standing alone, is insufficient to create a genuine dispute of fact. [Record No. 32, p. 3]

The Court agrees that there is no *genuine* dispute that the home was demolished prior to April 22, 2019. To establish a disputed fact, Rule 56 requires a party to "cit[e] to particular parts of materials in the record" that support its position. Fed. R. Civ. P. 56(c)(1)(A). The Estate has failed to point to specific evidence in support of its position, and numerous records confirm the defendants' argument.

First, Knouse's testified that the property was destroyed on April 13, 2019, two days after it was declared an imminent danger. This testimony is corroborated by the determination of imminent danger, dated April 11, 2019. [Record No. 33-1, p. 41] Additionally, the radio station reported the demolition, including photos, on April 13, 2019. [Record No. 34-3, p. 1] Next, various invoices and receipts from the demolition contractor also confirm that the home was razed prior to April 22. [*See* Record No. 33-2, pp. 1 (a demolition invoice dated April 18, 2019), 2-5 (landfill receipts dated April 16, 2019).] In fact, the City had placed liens on the property and paid the contractor for the completed demolition work by April 18, 2019. [*See* Record Nos. 33-1, pp. 42-43 (liens); 33-2, p. 6-7 (check).]

The Estate relies exclusively on the April 16, 2019, conversation between Ernst and Brown, but the inference it draws from this conversation is implausible. *See Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994) (The Supreme Court has "authorized an inquiry on summary judgment into the implausibility of inferences from circumstantial evidence, not an inquiry into the credibility of direct evidence.") (cleaned up). Ernst informed Brown on April 16 that

the City would "proceed with its nuisance ordinance enforcement" against the property.[16] [Record No. 34-3, p. 4]  At first glance, this would seem to suggest that the demolition had either not occurred or was incomplete as of that date.  But context provides clarity.  The statement was Ernst's third message to Brown; he first simply asked Brown to call him.  [*Id.* at p. 1]  But rather than call him, Brown responded that she was already consulting with counsel to determine how to proceed.  [*Id.* at p. 3]  If, as the Estate contends, the demolition had not yet taken place, Brown would have had to intuit from Ernst's request to call him that: the City was preparing to destroy the home; she needed to contact counsel; and, in the meantime, she needed to request that the City stay off the property.  But there is little chance she derived so much information from this mundane request.  It was only *after* Brown indicated that she wished for no one to enter the property that Ernst made the statement about nuisance enforcement.  [*Id.* at p. 4]  Thus, the entire conversation reveals that Brown did not, as the Estate contends, protest the demolition in advance.  [*See* Record No. 29, p. 4.]  The only plausible inference is that Brown was already aware of the demolition.  [*See* Record No. 34-4, p. 28 (comment by Brown on April 13, 2019, Facebook post.)]  And no jury could rationally conclude that the demolition occurred on April 22, 2019.  *See Matsushita Elec.*, 475 U.S. at 586-87.

Even though the demolition occurred prior to Brown being notified, the defendants provided adequate predeprivation process.  The process that is due requires a court to consider three factors:

---

[16]    Notably, this does not support the Estate's position that the home was razed *on April 22*. The Estate does not direct the Court to the source for its estimated date of demolition, and a review of the record does not reveal how that date was chosen.

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).[17]

Here, weighty interests lie on both sides of this balance. The Estate has a private interest in its property, and the City "has an interest in maintaining safe dwelling places and in protecting the interests of the public in general." *Roberts v. Girder*, 237 F. Supp. 3d 548, 555 (E.D. Ky. 2017). But when all the circumstances are accounted for, the second factor forecloses the due process inquiry in the defendants' favor.

Specifically, the risk of erroneous deprivation posed by the procedures used by the defendants was low. Although the parties seemingly wish to narrow the Court's focus to the days immediately surrounding the demolition, the due process inquiry must consider the full picture. *See Thomas v. City of Detroit*, 299 F. App'x 473, 476 (6th Cir. 2008). When the City began notifying Brown of ordinance violations in August 2017, the home had not been occupied for over nine years, and it was clear that the property it had not been maintained for nearly that long. [*See* Record No. 33-1, p. 4.] And the property was routinely subject to citations over the next twenty months.

Brown was properly served all seven citations by mail, but she did not contest one. [*See* Record No. 34, pp. 42-44] The first (and only) time the City heard from Brown was when

---

[17]     The Court is mindful that the Supreme Court has cast *Parratt* itself as "a special case of the general *Mathews v. Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." *Zinermon v. Burch*, 494 U.S. 113, 128 (1990).

she informed Knouse that she could not maintain the home in November 2017. [Record Nos. 33, p. 34; 34, p. 47] He implored her to appeal the citation, but she again forfeited that opportunity. [Record No. 33, p. 34] And despite her intentions to maintain the grounds, uncontested violations continued to pile up thereafter.

In this context, the defendants' actions in April 2019 were procedurally sound. At that point, a demolition citation had been in place for 18 months, and Brown had done nothing to keep the home from deteriorating. *See Thomas*, 299 F. App'x at 476 (Plaintiff's "five-year delay itself defeat[ed his] claim that he was not given sufficient" warning of the demolition.). She had been informally heard by the City through Knouse, who came away from the meeting with an understanding of her position as it concerned future actions toward the home. *See Roberts*, 237 F. Supp. 3d at 556 (Plaintiff's "informal meeting" at City Hall a year prior to the demolition of their home "reduced the risk of erroneous deprivation."). Thus, when Knouse noticed that the home had become an imminent danger, there was nothing else for the defendants to do but destroy the structure. *See Embassy Realty*, 572 F. App'x at 344-45 ("[T]he sudden demolition of a structure pursuant to an eleven-year old order" may violate the Fourteenth Amendment, but not where a city abates a nuisance.). Even setting aside the potential public safety risks, predeprivation notice would have been fruitless and unnecessarily dilatory. Brown was both notified and heard on the potential demolition of the home, and the Estate does not contend that she protested until after the demolition. In summary, the risk of an *erroneous* deprivation was low because Brown had seemingly acquiesced in the defendant's actions.

The Estate cites a pair of cases that do not alter the Court's conclusion. In fact, neither case found that the plaintiff's due process rights were violated. The Estate relies on *Embassy*

- 29 -

*Realty*, but the plaintiff in that case did not advance a procedural due process claim. 572 F. App'x at 340. And in *Davet v. City of Cleveland*, 456 F.3d 549 (6th Cir. 2006), the Sixth Circuit merely held that, under the facts of that case, the plaintiff was given "ample notice and an opportunity to be heard." 456 F.3d at 552. The facts are somewhat similar to the present case. There, the City of Cleveland posted a condemnation notice on the plaintiff's building warning that demolition was warranted if ordinance violations were not corrected by the following day. 456 F.3d at 551. The plaintiff discovered the notice three days later and filed an appeal and a lawsuit in state court, but the city nevertheless demolished part of the building four days later. *Id.* Two hearings were eventually conducted regarding the appeal, but it was upheld. *Id.* The remainder of the building was demolished thereafter, and the plaintiff filed suit. *Id.* The court was satisfied that the process provided was sufficient, but it did not purport to define what process was generally due.

The Estate contends that *Davet* requires a formal hearing prior to any demolition. [Record No. 29, p. 8] But the key difference in the present case is that Brown did not contest the demolition citation, which would have invoked the procedural protections provided in *Davet*. Ordinance 501 detailed numerous procedural safeguards that Brown willingly forfeited time and again. Thus, the current case is more analogous to *Thomas*, where the Sixth Circuit reasoned that a demolition without notice was procedurally proper despite the fact that the original demolition order was served five years before. 299 F. App'x at 476. There, just as here, "[n]ever, prior to the [emergency], did [the plaintiff] contest the Council's determination; and never, prior to the [emergency], did [s]he attempt to renovate or demolish the building h[er]self." *Id.* It follows that the defendants were entitled to demolish the property without a predeprivation hearing.

                              *     *     *

The foregoing analysis demonstrates that the Estate's constitutional rights were not violated as a result of the demolition. The City abated a public health risk that Knouse properly declared an imminent danger. Under the circumstances, the process the Estate seeks was not required. But even if it had been, the defendants' afforded adequate procedural protections against the risk of an erroneous deprivation of the Estate's rights. Therefore, the defendants are entitled to summary judgment on the federal claims.[18]

**B.     The State Claims**

Because the Court has determined that the defendants are entitled to summary judgment on the Estate's federal claims, it could decline to exercise supplemental jurisdiction over the state claims and dismiss them without prejudice. 28 U.S.C. § 1367(c). However, courts are "not obligated to do so." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 196 F.3d 617, 620 (6th Cir. 1999). Instead, the decision is discretionary and "is based on a balancing of the interests involved: 'judicial economy, convenience, fairness, and comity.'" *Smith v. Franklin Cty.*, 227 F. Supp. 2d 667, 679 (E.D. Ky. 2002) (quoting *id.*). Here, those interests favor retaining jurisdiction. This matter has been pending for nearly 13 months, discovery is complete, and the parties have briefed the state law issues to the same extent as the federal

---

[18]     In the alternative, the defendants argue that Knouse is entitled to qualified immunity. The Estate failed to address Knouse's immunity in its motion and did not respond to the defendant's arguments. Nevertheless, "[w]here, as here, no constitutional violation has occurred, [the Estate] cannot claim that [Knouse] can be held civilly liable under § 1983 for his actions." *Tallman v. Elizabeth Police Dep't*, 344 F. Supp. 2d 992, 997 (W.D. Ky. 2004). Thus, the Court's conclusion that the Estate's constitutional rights were not violated leads *a fortiori* to the conclusion that Knouse is entitled to immunity. *See Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996) ("The first step in a qualified immunity analysis is whether, based on the applicable law, a constitutional violation occurred.").

issues.  *Id.*; *cf. Gambrel v. Knox Cty.*, 476 F. Supp. 3d 580, 603 (E.D. Ky. 2020) (jurisdiction declined because, among other reasons, the parties devoted very little briefing to the state issues).  Additionally, as illustrated below, the substance of the state claims overlaps with the federal claims.  Thus, the Court elects to retain jurisdiction over the Kentucky claims.

### i.      The Kentucky Constitutional Claims

The Estate contends that its rights were violated under Sections One and Two of the Constitution of Kentucky.  The first section lists seven "inalienable rights" of all Kentuckians, including "[t]he right of acquiring and protecting property."  Ky. Const. § 1.  The latter section contains a general premise underlying Kentucky's form of government: "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."  Ky. Const. § 2.  These provisions combine to set the outer limit of the state's police power, which lies where "public necessity" ends.  *Johnson v. City of Paducah*, 512 S.W.2d 514, 516 (Ky. 1974).  Generally, demolition without either prior notice or compensation "amounts to a taking of property rights" under Kentucky law.  *Washington v. City of Winchester*, 861 S.W.2d 125, 127 (Ky. Ct. App. 1993).   But where an action is reasonably "necessary to prevent the infliction of a public injury," it falls squarely within the police power of a city.  *Bruner v. City of Danville*, 394 S.W.2d 939, 943 (Ky. 1965) (citing *Tolliver v. Blizzard*, 143 Ky. 773 (1911)).

The Estate contends that the defendants' actions amounted to "a unilateral and illegitimate action by [the defendants] without affording the [Estate] any due process or opportunity to protect their property."  [Record No. 29, p. 10]  It further argues that the defendants' "condescending approach . . . was certainly an act of bad faith" that amounted to an exercise of arbitrary and absolute power over the property.  [*Id.* at p. 11]

The Estate's arguments are misguided for a number of reasons.  First, the defendants note that Kentucky has not recognized a private right of action for claims arising under its state constitution.  [Record No. 30-2, p. 20]  In *St. Luke Hospital, Inc. v. Straub*, the Supreme Court of Kentucky unequivocally held that "an action for money damages under K.R.S. § 446.070 is not available for alleged constitutional violations," and it declined to "create judicially a new constitutional tort in Kentucky because adequate remedial alternatives exist in the common law."  354 S.W.3d 529, 531–32 (Ky. 2011).  Section 446.070 empowers a "person injured by the violation of *any statute*" to recover damages from the violator.  K.R.S. § 446.070 (emphasis added).  This Court has since reasoned that "Kentucky law does not recognize a cause of action for alleged violations of Kentucky constitutional rights."  *Faul v. Bd. of Educ. of Danville Indep. Sch.*, No. 5:12-CV-277-KSF, 2013 WL 1511746, at *3 (E.D. Ky. Apr. 9, 2013) (citing *id.*).  The Estate's claims seek monetary damages for alleged violations of their constitutional rights under Kentucky law.  Therefore, the claims fail as a matter of law, and the defendants are entitled to summary judgment on the state constitutional claims.

Moreover, Kentucky's courts have held that Sections One and Two of its constitution require the same procedural protections as the United States Constitution.  *See Transportation Cabinet v. Cassity*, 912 S.W.2d 48, 51 (Ky. 1995) (applying federal due process standards to a challenge under Section Two); *Jones v. Clark Cty.*, No. 2018-CA-001710-MR, 2020 WL 757095, at *6 (Ky. Ct. App. Feb. 14, 2020) (Section One's protections are "coextensive with the due process provisions of the United States Constitution.").  And as the above analysis indicates, the defendants complied with federal due process standards.

Finally, as explained previously, the defendants did not commit a taking that would entitle the Estate to compensation.  *See Polsgrove*, 157 S.W. at 1136.  The Estate suggests that

the procedural protections attendant to a condemnation are applicable. [Record No. 29, p. 9 (citing *Terhune v. Gorham*, 225 Ky. 249 (1928), for the proposition that "any condemnation of a private property before the owner [i]s paid" violates Section One of the Kentucky Constitution)] However, Kentucky law defines condemnation as a taking of "private property for a public use under the right of eminent domain." K.R.S. § 416.540. If a city wishes to condemn property, it must initiate proceedings in state court. K.R.S. § 416.570. On the other hand, cities are permitted to take "immediate action" to abate ordinance violations that present "imminent danger." K.R.S. § 65.8838.

### ii.   The Kentucky Eminent Domain Act Claim

This claim fails for the reasons just given. Kentucky prescribes the procedures a local government must follow to condemn property. K.R.S. §§ 416.540, *et seq.* The Estate contends that the defendants were required to follow these procedures. [Record No. 29, p. 12] However, it has not challenged the emergency provision of Kentucky law that allowed the defendants to act without prior notice, nor has it alleged that Ordinance 501 violated Kentucky law. Additionally, the property still belongs to the Estate. [Record No. 30-2, p. 21] Ordinarily, title to condemned property passes to the condemnor. *See* K.R.S. § 416.620(6). Accordingly, the defendants are entitled to summary judgment on the Estate's claims under the Kentucky Eminent Domain Act.

### iii.   The Trespass Claim

Under Kentucky law, "[a]ny intended intrusion or encroachment which is not privileged is actionable [as a trespass] without regard for the shortness of the period of the interference, or the absence of pecuniary harm." *Smith v. Carbide & Chemicals Corp.*, 226 S.W.3d 52, 54 (Ky. 2007) (citation omitted). Kentucky courts generally follow the

Restatement (Second) of Torts.  *Rockwell Int'l Corp. v. Wilhite*, 143 S.W.3d 604, 619 (Ky. Ct. App. 2003).  Under the Restatement, an officer empowered by law to abate public nuisances is presumed to have a "privilege to enter land in the possession of another for the purpose of determining whether a public nuisance exists."  Restatement (Second) of Torts § 202 (1965).

The defendants invoke the Restatement and contend that any entry onto the property was privileged.  [Record No. 30-2] The Estate seems to suggest that the privilege ended on April 16, 2019, when Brown informed Ernst that no one was permitted on the property. [Record No. 29, p. 13]  Specifically, it contends that the defendants "entered upon [its] property to demolish the home despite objections by [Brown]."  [*Id.*]  Thus, its trespass claim is effectively foreclosed by its failure to create a genuine dispute of fact regarding the date of demolition.  As the Court has explained, the home was demolished prior to Brown's request. Even so, Brown testified that she was not aware of any unauthorized entry onto the property after she protested further actions on April 16, 2019.  [Record No. 34, p. 85]  Thus, the Estate has failed to establish than an actionable intrusion occurred, and the defendants are entitled to summary judgment on the trespass claim.

## IV.   CONCLUSION

The Court agrees with the defendants that "[i]t would be hard to expect" them to have proceeded any differently in this matter.  [Record No. 30-2, p. 16 n.22]  The home at 135 Hustonville Street had been unlivable for over a decade, and its apparent caretaker was, at best, equivocal about her intent to help prevent the structure from being completely overtaken by the elements.  By the time the situation required imminent action, nothing indicated that notifying Brown would alleviate the threat.  Had the discovery of the cabin not prompted a local media report, the plaintiffs may have gone another decade without realizing the home

had been destroyed.  In short, the home had been abandoned in the purest sense: not only was it unoccupied, but the plaintiffs seemingly had given up on it.  Under these circumstances, the defendants were entitled to abate the threat to public health without offending federal or state law.  Accordingly, it is hereby

**ORDERED** as follows:

1.      The plaintiffs' motion for summary judgment [Record No. 29] is **DENIED**.

2.      The defendants' motion for summary judgment [Record No. 30] is **GRANTED**.

3.      The jury trial, previously scheduled for June 7, 2021, is **CANCELED**; all other deadlines contained in the Scheduling Order [Record No. 11] are **VACATED**.

Dated: April 9, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky